

**FILED**

**AUG 0 8 2022**

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE SEARCH OF STORED ELECTRONIC DATA CONTAINED IN A SAMSUNG SMART PHONE (IMEI 351358221607138) ASSIGNED THE TELEPHONE NUMBER OF (276) 274-6810, AND WHICH WAS POSSESSED BY STEPHANIE TOWNSEND ON OR ABOUT JULY 21, 2022, AND WHICH IS NOW POSSESSED BY THE JOHNSON CITY POLICE DEPARTMENT | Case No.: 2:22-MJ-142<br><br>**UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Peter Gonzalves, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure for stored electronic data contained in a black Motorola smart phone (hereinafter known as "TARGET DEVICE")—which is an electronic device—that was seized from the possession of Stephanie TOWNSEND (hereinafter, "TOWNSEND") which is currently in the possession of law enforcement, and the extraction from that property of electronically stored information described in **Attachment B**.

2. I am a Special Agent with the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") and have been so employed since August 2016. I am currently assigned to the Bristol, Virginia Field Office. Prior to becoming an ATF Special Agent, I was a Special Agent with the US Department of State, Diplomatic Security Service for approximately six years. I have taken

part in numerous federal, state, and local investigations concerning document and identity fraud, financial fraud, cybercrimes, and firearms and controlled substance violations.

3. I am an investigative law enforcement officer of the United States within the meaning of Title 18 United States Code Section 3051. I am empowered by law to conduct investigations, seize evidence, and make arrests for violations of criminal statutes of the United States.

4. During my tenure in law enforcement, I have become familiar with the methods and techniques associated with the distribution of controlled substances, the laundering of drug proceeds and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance: controlled buys; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register data; requesting, collecting and analyzing billing records; and conducting court-authorized electronic surveillance. Further, I have participated in the preparation, presentation and execution of numerous search and arrest warrants which have resulted in the recovery of weapons, controlled substances, money, and documentary evidence indicative of firearm and narcotic trafficking organizations. Additionally, I have assisted in investigations and arrests leading to convictions for violations of federal and state firearms and controlled substance laws.

5. Through instruction and participation in investigations, I have become familiar with the manner and methods by which controlled substance traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their illicit activities. From experience and training, I have learned, among other things, that in conversations drug

traffickers believe susceptible to interception, they virtually never expressly refer to the illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.

7. Based on my training and experience and the facts, as set forth in this affidavit, I submit that there is probable cause to believe that TOWNSEND and her co-conspirators (both known and unknown) have committed the following violations: conspiracy to distribute and to possess with intent to distribute methamphetamine, a scheduled II controlled substance, in violation of Title 21 U.S.C. § 846 and § 841(a). I also submit that there is probable cause to search the information described in **Attachment A** for evidence, contraband or fruits of these crimes, as described in **Attachment B**.

8. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## JURISDICTION

9. This Court, the United States District Court for the Eastern District of Tennessee, has jurisdiction to issue the requested warrant pursuant to 18 U.S.C. § 3102 and Rule 41 of the Federal Rules of Criminal Procedure.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

10. The TARGET DEVICE is a Samsung smart phone, with IMEI 351358221607138, which is assigned the telephone number of (276) 274-6810. Investigators with the Johnson City Police Department (JCPD) seized the TARGET DEVICE from TOWNSEND after conducting a traffic stop of a vehicle in which she was operating, and a search of the vehicle revealed

approximately 282 grams of suspected crystal methamphetamine. TOWNSEND is now under further investigation for conspiracy to distribute Schedule II controlled substances (methamphetamine) in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Since its seizure the TARGET DEVICE has remained in the lawful custody of the JCPD.

11. While the JCPD might already have all necessary authority to examine the TARGET DEVICE, I seek this additional warrant out of an abundance of caution to be certain that an examination of the TARGET DEVICE will comply with the Fourth Amendment and other applicable laws. In my training and experience, I know that the TARGET DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICE first came into the possession of the JCPD.

**PROBABLE CAUSE**

12. On April 19, 2022, Bristol, Virginia Police Department (BVPD) officers and investigators executed a state search warrant at the residence of Robert HOCKETT (hereinafter, "HOCKETT"), which was located at 437 Norfolk Ave. in Bristol, Virginia. During a search of the residence, officers and investigators recovered a quantity of suspected crystal methamphetamine in excess of 1,500 grams, approximately 125 grams of suspected heroin, approximately $28,000 in US currency and numerous rounds of assorted ammunition. BVPD officers also seized two cellular telephones from HOCKETT's possession. The search and seizures occurred within the city limits of Bristol, Virginia, which is located in the Western District of Virginia.

13. During a post-*Miranda* interview, HOCKETT stated he allowed an acquaintance named "Blocc" (known to investigators as Tyshawn BLACKWELL (hereinafter,

"BLACKWELL")) to have unknown quantities of crystal methamphetamine delivered to HOCKETT's residence to be stored/stashed at 437 Norfolk Avenue. Over a period of approximately one month, deliveries of crystal methamphetamine occurred once a week at HOCKETT's residence. HOCKETT stated that in December of 2021 and prior to the deliveries to the Norfolk Avenue location, BLACKWELL began supplying HOCKETT with controlled substance. HOCKETT stated that on more than one occasion, BLACKWELL paid HOCKETT approximately one ounce of crystal methamphetamine and $500 in U.S. currency for the use of HOCKETT's house. According to HOCKETT, BLACKWELL used the residence as a stash house but did not share many details with HOCKETT about the deliveries. HOCKETT further stated that he communicated with BLACKWELL primarily via phone calls and text messages.

14. I am aware from my training and experience that drug traffickers will often identify and utilize a location separate and away from their own residence as a location to store or stash contraband, including illegal narcotics. Furthermore, I am aware from training, education, and experience, that the trafficking of illegal narcotics is reliant upon the open flow of communications between those who are a source of narcotics and those who are seeking narcotics. Drug traffickers will often utilize cell phones or "smart phones," to communicate with other persons involved in the conspiracy to distribute narcotics, including without limitation, those who are transporting, delivering, or purchasing illegal narcotics. The use of such devices assists in communications and are often used to establish meeting, identify locations, and to otherwise exchange communications related to the distribution of illegal narcotics.

15. When asked to elaborate as to the details of the weekly deliveries to his residence, HOCKETT stated several unknown black males in different vehicles with Georgia license plates

would make the deliveries. HOCKETT also commented that on several occasions he witnessed these unknown individuals carrying firearms.

16. Later in the interview, HOCKETT provided the pattern to unlock his primary cellular telephone and consented to investigators reviewing the contents. HOCKETT also provided the code to unlock his second device. During the review of HOCKETT's primary device, agents discovered text messages with a contact labeled "Block." There were several messages that appeared to indicate HOCKETT ordered controlled substances from BLACKWELL. For example, in one message to BLACKWELL, HOCKETT said "need boy."

17. Based on my training and experience, I know "boy" is a commonly used street term for heroin. Based on my training and experience and HOCKETT's statements, it is reasonable to conclude these messages are related to trafficking of controlled substances.

18. On July 21, 2022, investigators observed a vehicle known to be operated by TOWNSEND parked in front of BLACKWELL's residence, located at 505 E. Fairview Avenue in Johnson City, Tennessee. Your affiant observed TOWNSEND exit the vehicle and briefly enter the residence with BLACKWELL. A short time later, TOWNSEND returned to the vehicle and departed. Investigators followed the vehicle as it departed the residence. Investigators observed the vehicle stop several blocks away from BLACKWELL's residence and pick up a white male passenger. The vehicle then entered Interstate 26, westbound. After observing the vehicle exceeding the posted speed limit on a public roadway, investigators with JCPD conducted a traffic stop on the vehicle. The traffic stop occurred within the city limits of Johnson City, which is located within the Eastern District of Tennessee.

19. JCPD investigators determined TOWNSEND to be the driver, and Eric Hurley was sitting in the passenger seat. During the course of the traffic stop, JCPD investigators used a K9

to perform an open-air sniff around the vehicle's exterior. The K9 alerted to the odor of controlled substances around the vehicle. A subsequent search of the vehicle revealed approximately 282 grams of suspected crystal methamphetamine concealed under the front passenger seat.

20. Based on my training and experience, I know a quantity of 282 grams of crystal methamphetamine far exceeds what could reasonably be considered a user-level quantity and is consistent with distribution activity.

21. JCPD investigators determined Hurley had outstanding arrest warrants from other jurisdictions and took Hurley into custody. JCPD investigators took TOWNSEND into custody based on the drug seizure.

22. JCPD investigators located and seized a total of three (3) cellular telephones from TOWNSEND's possession. The first device is a black Samsung (TARGET DEVICE) which TOWNSEND stated she used to communicate with BLACKWELL. A sticker is affixed to the black Samsung displaying the IMEI number. The second is a blue Motorola which was powered off at the time of seizure. The third device is a black Motorola which displayed a photograph of TOWNSEND and a white male as the lock screen background. Hurley had his own phone in his possession at the time of arrest.

23. During a post-*Miranda* interview, TOWNSEND stated she received the crystal methamphetamine from BLACKWELL at his residence. TOWNSEND was surprised to learn the quantity was approximately ten ounces, and stated it was only supposed to be eight ounces. TOWNSEND further stated she had picked up meth from BLACKWELL on several occasions previously and at other locations, typically four to five ounces per trip.

24. When asked how she communicated with BLACKWELL, TOWNSEND stated she used TARGET DEVICE to call and exchange text messages with BLACKWELL. She also stated

she sometimes used Snapchat to communicate with BLACKWELL, however she was logged into Snapchat on a device located at her residence in Bristol, Virginia.

25. Investigators have been monitoring BLACKWELL's telephone contacts via a Pen Register/Trap and Trace (PRTT) since approximately May 11, 2022. PRTT data shows BLACKWELL's number in frequent contact via voice calls and text messages with telephone number (276) 274-6810. TOWNSEND listed this number in her user account with the Southwest Virginia Regional Jail Authority (SWVRJA) used to communicate with inmates. HOCKETT and others who are currently incarcerated frequently contact (276) 274-6810. TOWNSEND also provided this number to HOCKETT in a message on or about July 14, 2022. Through the course of this investigation, investigators have also documented TOWNSEND communicating with inmates at the SWVRJA utilizing several different telephone numbers.

26. Given the number of features on a modern cellular phone, including, without limitation - available applications such as secure instant messaging, local and long distant telephone capabilities, internet access, tracking and location services, digital cameras for video and photographs, and the ease of portability and concealment due to their size, I am aware that drug traffickers and those involved in drug trafficking often possess and use cellular phones as a part of their drug trafficking operations. Cellular phones, even with many modern features, are often inexpensive and drug traffickers will often discard or "dump" a cellular phone if they believe law enforcement is closing in on their operations to avoid detection and further monitoring by law enforcement. For this reason, it is not uncommon for drug dealers to carry more than one cellular phone at the same time and have the same contact information on each cellular phone to allow for a seamless transition to a new cellular phone after losing a cellular phone or dumping a "hot" phone.

27. Therefore, it is reasonable to conclude TOWNSEND may have used TARGET DEVICE or any other device found in her possession to communicate with customers or suppliers. TOWNSEND's statement that she had only recently obtained the Samsung phone (another of the three phones found in TOWNSEND's possession) suggests conduct – that is, switching cellular devices - that is consistent with drug traffickers' efforts to conceal illicit activities from detection.

28. Based on my training, experience, and research, I believe that TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, Internet access, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## WIRELESS TELEPHONES

29. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. The current generation of "smartphones" also provides the capability to employ third-party applications ("apps") to provide additional messaging, voice communication, and media capabilities. The aforementioned data can also be located on a device contained within these apps.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data.

Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30.    As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when/where the device was used. There is probable cause to

believe that this forensic electronic evidence might be on cellular telephones seized because data on the device can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

31. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or wireless telephone is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33. *Forensic evidence.* As further described in **Attachment B**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on TARGET DEVICE because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore,

contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  34. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

  35. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

  36. Based on the forgoing, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of TARGET DEVICE described in **Attachment A** to seek the items described in **Attachment B**. I request that the Court issue the proposed search warrant.

## REQUEST FOR SEALING

  37. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to

an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet and may disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____
Special Agent Peter Gonzalves
Bureau of Alcohol, Tobacco, Firearms, and Explosives
United States Department of Justice

Subscribed and sworn to on this 8th day of August, 2022

_____
THE HONORABLE CYNTHIA WYRICK
UNITED STATES MAGISTRATE JUDGE IN THE
EASTERN DISTRICT OF TENNESSEE

# ATTACHMENT A

The property to be searched is a black Motorola Cellular Telephone that was located by law enforcement officers in Stephanie TOWNSEND's possession, hereinafter "TARGET DEVICE." TARGET DEVICE is currently located at the Johnson City Police Department in Johnson City, Tennessee, which is within the Eastern Judicial District of Tennessee.

This warrant authorizes the forensic examination of the target device and stored electronic data contained therein for the purpose of identifying the electronically stored information described in **Attachment B**.

# ATTACHMENT B

1. All data on TARGET DEVICE described in **Attachment A** that is evidence of violations of Title 21 U.S.C. § 846 and § 841(a) involving Stephanie TOWNSEND and suspected co-conspirators, known and unknown, including:

   a. lists of customers or suppliers, their phone numbers or social media identifiers, and related identifying information;

   b. types, amounts, and prices of drugs or firearms trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs or firearms (including names, addresses, phone numbers, or any other identifying information);

   d. Text messages or third party application data, including photographs or videos, relating to the distribution of controlled substances, firearms, violent crimes and any conspiracy to distribute controlled substances or firearms;

   e. any information recording HOCKETT, BLACKWELL, or TOWNSEND's schedule or travel from January 1, 2022, to the present;

   f. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the target device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, third party application data and browsing history.

3. Records evidencing the use of an Internet Protocol address to communicate with Google, Yahoo!, Snapchat, and Facebook including:

   a. records of Internet Protocol addresses used;

   b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.